of America. Mr. Berger, representing the plaintiff. You there, Mr. Berger? I am, Your Honor. I'd have to meet this way. If any of y'all have a problem hearing me, just let me know. May it please the court, my name is Bruce Berger. I'm an attorney here in Raleigh, and along with Jim Craven, who's in the room with me, represent the estate of Michael Krembel, who is both the plaintiff and the appellant. I know y'all have read the briefs, and I'm not going to belabor the facts, but I do think there's a few pertinent facts that we'd like to address. Because of a squamous cell carcinoma in his scalp, Mr. Krembel was transferred to Butner in June of 2013. He was evaluated by a dermatologist in July, on July 8th of 2013, who recommended immediate, meaning within the month, according to his note, surgery for the carcinoma. That was immediately approved by the review board at Butner, but nothing happened at all with regard to Dr. Katz's recommendations until October 15th, when Mr. Krembel saw a second surgeon who also immediately recommended surgery. And unfortunately, again, nothing happened with regard to that surgery for a couple of months. It's very important to note that during this time, from July to October, and then from October to December, Mr. Krembel remained at Butner. He was seen at the medical clinic literally every day, having his scalp wound treated, meaning cleaned out at that point, because there really was no treatment. Finally, by the time he got back to Duke in December of 2013, he was no longer a surgical candidate for the relatively benign, called nose, MOHS surgery that they had recommended, because the cancer had spread, had gotten deeper, which resulted in an extremely longer, much more severe, course for Mr. Krembel, and I'll mention that in just a few minutes. The important point of reviewing that is that this case, from our standpoint, and we believe it's clear from the pleadings, is about a delay in getting necessary treatment, initially between July 8th and October, and then between October and the remainder of the year. But as I understand the facts, even as you recite them, the DOP did what they were supposed to do and what they could do under their contract. Well, Judge, that is exactly, I think, what the problem is that we have with both the district court's opinion and the government's position, is we disagree with that. They didn't do what they were supposed to do, which was not to schedule him for treatment, but to get him treatment, and that's what didn't happen. So what is it that the DOP should have done, and how could they have done it, given the contract that they have with the other entity? Well, the BOP was literally in daily contact with Mr. Krembel, who was at their facility. They saw him every day. They knew of the orders from both of the doctors that he needed the immediate treatment. They knew literally on a daily basis after that first 30 days that that had not happened, and they took no action to look into why he wasn't getting the treatment to actually make sure he got the treatment. So we believe, although the University of Massachusetts, which, of course, nobody really knew about, may have not scheduled it, the BOP had the duty to have him treated, not just scheduled for care, and that's where they dropped the ball. Well, the University of Massachusetts had a person on the scene at Butler, did it not, who was called the scheduler? As I understand it, the scheduler was in Massachusetts, although, to be honest with you, I don't know where the scheduler was. Well, I certainly don't either. I'm sorry. From reading some of the papers, I was under the impression that the scheduler was there at Butler. Yeah, I went to. Let me add further, though. I think this really gets to the crux of the issue, though. If, you know, scheduling is one component of it, and this would have been a different situation, for example, if Mr. Kremble had been, you know, someplace else, a call didn't take place, and he had some option of, you know, had he disappeared from the facility, had he been released? And it wasn't scheduled. That would be one thing. But he was at the facility, literally going to the clinic every single day. We understand all that. But the jury appraisal had contracted with the University of Massachusetts medical people to provide these services to the services that we're talking about here. These types of services at Butler and the University of Massachusetts was an independent contractor. They weren't supervised by the people at Butler. Well, what the University of Massachusetts did was not schedule him, but Butler, who held Mr. Kremble, never took care of getting him the actual treatment. They never looked back into the question. I mean, he was there at Butler. Well, what about the declaration that we have in the record from the BOP that says that the contract between the BOP and UMass does not require follow-up, which is, you know, follow-up to, I guess, make sure that UMass did what they're supposed to do? What are we to do with that? Well, I think one of the problems is that, first of all, I think under federal law, under the statute, the BOP had the duty not just to schedule him for care, but to get him the care, number one. And secondly, the contract, you know, Butler had policies, which are in the record, that required re-evaluation continuously of Mr. Kremble and other people seeking medical care. And so Butler's own policies say that they had to continue to re-evaluate the patient and get him the care that he needed. So even if UMass dropped the ball in not scheduling that appointment, the day-to-day, ongoing, continuous relationship between Kremble and Butler, who had the legal duty to make sure not just that the care was scheduled, but he actually got the care, is where we believe were negligent. I want to ask you a question regarding the duty of the care that you're alluding to here. And I need you to carefully differentiate this for me. What are we talking about here? Are we talking about a medical malpractice-type action or the medical standard of care? Are we talking about a common law standard? What is the duty that you ascribe to the defendant in this case? Yeah, Judge, that's a great question. No, so it's very clearly we are not talking about medical malpractice. What we're talking about is a violation of 18 U.S.C. 4042, which says that the BOP shall provide suitable quarters and provide for the safekeeping care and subsistence of all persons charged with or convicted of offenses. So we're talking about a common law duty of negligence. Negligence, I mean, that duty, breach of duty and damages ultimately under North Carolina law, but created by the federal statute. So you are saying that the presence of Butler having a medical facility, none of that duty arises from the doctors or the medical people there failing to do something. And you are tying this on the statutory duty that falls on the corrections center as a whole. Yes, that's correct, Your Honor. And I will point out that we actually have no – we are not critical of the doctors at all. It's not because we think that he was ordered to have the care that he needed, but that Butler mechanically, logistically failed to make that happen. The doctors recognized the problem. They diagnosed it timely. They ordered the appropriate care, and the ball was dropped by Butler in getting that done. And that's it. We believe that, just as you say, that that's a breach of the common law duty based upon that statute. Wait a minute now. I want to make sure. You said common law duty based upon that statute. Break that down for me a little bit. Is it based upon the duty created by statute, or is it a common law duty? Well, the statute says that the government's to provide the care for the prisoners, but the negligence, whether or not they breach that care, I think is a common law. So it arises from the statute, but it's analyzed on the basis of common law negligence and not medical malpractice. So what are you talking about? A reasonable care under the circumstances under that statute? Yes, sir. Yes. I didn't mean to interrupt you, but that's precisely. I'm just trying to follow through, because I think it relates to the other question, and that is the question of did it need to actually ensure that he get the surgery or just follow the schedule? That's kind of the conundrum here. Well, I think that he needed to get the surgery as recommended by the doctors who saw him on two different occasions, and that's where they failed. Not just kind of whenever, but they specifically said when it needed to happen. He was in their care. He was a captive audience. They knew of the care, and they never allowed that to happen, and that's what we believe the negligence was, which we believe is created or is established in part by a violation of their own policy. And where do you get the waiver of the sovereign immunity under the Federal Tort Claims Act? How do you get this under the Federal Tort Claims Act? Well, under the Federal Tort Claims Act. Go ahead. I'm sorry. They say they made a contract with the University of Massachusetts, an independent contractor, to provide these services. That's what the United States of America is saying. Of course, he's going to stand up there and explain it better than I can. That's what I read, anyway. And you don't bring an eighth amendment claim. We do not. We think it's a Federal Tort Claims for simple negligence, not an eighth amendment claim for deliberate indifference. I agree with that. But that Tort Claims Act is strictly construed. It's a waiver of sovereign immunity. It's limited to what's in the act. I completely agree with that, Judge. And where we disagree with the government on this position in the district court is that it was when the University of Massachusetts did not schedule Mr. Kremble, that was one thing. And they may be negligent, but it's Butner's negligence, their independent negligence, in not getting him needed care. You're saying that Butner should have controlled what the University of Massachusetts did in performing their contractual obligations. No, sir. Actually... That runs head on into what an independent contractor is. You don't have an independent contractor relationship if there's a control of the so-called independent contractor. Then they're an employee. You know, Judge, that's really not what we're saying. What we're saying is that this guy was housed at Butner, and when the ordered care, because of a scheduling problem didn't occur, that every single day at Butner, Butner had the opportunity and the obligation to go back and say, what's going on here? Why hasn't he gotten the care? This hasn't happened. You know, they had that obligation ongoing by their own policies. But that, what you just described, you know, the obligation you're saying they have to go back and say, what's going on here? Why hasn't this happened? What you just described is requiring the BOP to exercise day-to-day control over their independent contractor, which, as Judge King says, recognizes is at odds with what an independent contractor relationship is. You know, I don't... That's the problem we have, or I have. They can't contract out of their statutory responsibility. I think that they have the ongoing responsibility to go back to Massachusetts, to go back to somebody and say, this guy was ordered to get care, and it hasn't happened. I mean, they can... And where do you find support for that ongoing responsibility? Well, one, the statute that says that it's the government that has it. And secondly, in their policies, which are in the record, that say that the government has the duty not just to schedule care, but to actually ensure that the care happens. I think that their own policies provide... May I just finish this answer? You sure can. You go right ahead. Thank you. I think their own policies provide that they have the duty to get the guy the care he needs. They can do it through contract, but the duty ultimately is theirs. Thank you. Thank you, Mr. Berger. Let's see. We're now going to hear from the government. Yes, Your Honor. May it please the Court. I am Rudy Renfer with the United States Attorney's Office for the Eastern District of North Carolina, and I represent the United States in this matter. Good to have you here, sir. Well, thank you. I'm glad to be here, even though it's only telephonically. Yes, sir. In this case, the ultimate question being, did BOP owe a duty to ensure that Mr. Krimble obtained necessary medical care for a terminal illness? The short answer is no. They did not owe a duty outside of 28 United States Code 4042. That duty is one of... Mr. Berger says that's enough, doesn't he? He's in your custody, and he's over at Butler, and you're all supposed to take care of him. Yes, sir. But what Mr. Berger's position seems... Rawl appeal to me. Well, I think that position tends to ignore Supreme Court decisions back in the early 70s that specifically recognized that agencies like BOP, or BOP has the authority to contract out some of the care that's required under 4042. So by actually contracting for specialty medical care and the scheduling of specialty medical care, they are fulfilling their obligation under 4042 to ensure that the inmates get the appropriate medical care, because sometimes medical care can be simple in the form of a cold or a sprained ankle. But oftentimes, especially with BOP, when you have inmates who tend to serve longer sentences than they do in the state prisons, they'll develop health problems which become more complicated and will require the services and scheduling of specialty providers that BOP simply does not have at Butler. And in order to ensure these patients get the care they need, they enter into... That this contract that you all made with the University of Massachusetts was pursuant to the statute that he cites? What I'm saying is, Your Honor, what I'm saying is that under 4042, they're supposed to provide the basic necessities and that Congress allows BOP to contract out some of those services that provide the necessities. And that's precisely what they did in this case. And they made a contract with the University of Massachusetts? Correct. And they used their discretion. That's what you're dependent on here. But why did you keep the contract secret? That's what kind of bothers me. You kept the contract secret. How would anybody... How would Mr. Krimble have known this? Or how would anybody representing him know this if you got the contract secret? Well, I... It had all been signed out to Massachusetts. Well, I don't think the contract was secret. I mean, it wasn't... It wasn't something that they actively did from... In the field? I think it was briefly in district court. But then upon further discussion with BOP counsel, we decided it really didn't need to be sealed. Well, that could be... And quite frankly, that could be another case. But it is sealed in this case. But it's not... It's not something... I was the only person sealed in this case. Yes, yes, Your Honor. I was just saying, I think I misspoke just then. Okay. So... But no, it's not... It's not that it was... It was not that it was... Why is it sealed? I mean, the prisoners like Mr. Krimble and those similar to him at any institution should know that if a European is farmed out, their obligation is to provide medical services to some private hospital. Right. Well, okay. So if you take this case as an example, Mr. Krimble, there was never a FOIA request. There was never a FOIA request. There was never any type of administrative remedy seeking that information. And quite frankly, if Mr. Krimble was... This man is suffering from cancer and waiting on a surgery and you're saying he should make a FOIA request? No, Your Honor. I'm saying... I'm not saying that's a recommended course of action, but I'm saying there are methods out there of doing it. And one of the things that I was about to say was that, you know, if he's seeing these medical professionals at BOP every day, I don't think he's established that he even sought information about who was scheduling. I mean, quite frankly, you know, practically speaking, all it takes perhaps is a few questions of the folks that he sees there to say, hey, who is doing the scheduling for this? Because I haven't seen... I haven't been seeing somebody. And they'll say, oh, that's you, Matt. Here's a concern I have and appreciate the work you're doing on this. And it's an interesting situation because one of the situations that arises here is he's in custody. He does not have freedom of movement. He can't do anything. And while you can develop a contract for medical care, the contract does not contract away the duty or the custodial duty that you have to keep it. So he is limited as to what he can do because he's in prison. And given the fact of that, the question then becomes, is this a different case than someone who is maybe going to a regular medical facility? And they say, well, we contract that part of our care away and you need to check back with us and keep checking with us. Without direct contact of the independent contractor, that's what Judge King is getting to. Does he have privy or does he have any connection with the independent contractor to get that message to him? And even if he does, they have him in custody. And if I understand this injury and what it has got, I tell you, it sounded very horrific. Because I understand it was smelling and had all kinds of things going with it. And this is on his head. It's a horrible situation. And I'm trying to, what do you think? Don't you think there's a different level of duty if you have someone in custody and you control their every motion and not the independent contractor? No, Your Honor. The duty arises under 4042. And the standard for that duty is one of reasonableness and diligence. Now, I think what appears to me that some of the issues surrounding this case are... Let me make sure we're interpreting that. And I think you're right. It does say reasonable care under the circumstances. I'm addressing the circumstances. And here's the circumstances. So we're talking about a prison. That's what we have. That's what I want you to go to. Okay. So in the circumstances involving a prison, as far as the independent contractor exception, I'm taking this case as an example. Assuming that, you know, no reason to question opposing counsel's representation, they know about the independent contractor until relatively recently. In this case, they filed the tort claim, the SF-95. They exhausted the remedies. They filed the lawsuit. And then when the first motion to dismiss gets filed three years ago, they're informed of the independent contractor at that point. As far as I can tell, no steps were taken to pursue that line of discovery and to try to pursue the independent contractor for negligence. They've had the opportunity for three years now. And they're resting all their laurels on the fact that because he was in BOP custody, BOP must be at fault. And that is contrary... ...of negligence by both parties. I mean, wouldn't the government have the same option under the Federal Tort Claims Act to seek contribution or indemnity from the University of Massachusetts? If under the law, BOP would remain liable for negligence of an independent contractor. But under the Tort Claims Act, the United States can only be liable for negligence of its employee. And in this case, there's been no showing that a BOP employee was negligent in any manner, shape, or form. You don't have to think about it in a common sense. If you've got a guy in prison and they say, you've got to have surgery to remove this very aggressive skin cancer, and you need it right now, you've got to doctor this now, and yet it's five months later and this thing is festering and all kinds of stuff on it, and he's in prison. And it's the button of the Federal Medical Center. It's not just any type of ailment you've got here. It just doesn't sound right. I follow the law in terms of independent contractors doing that, but there are certain things, if you have control of an individual, the question is, to what extent can you point the finger at somebody else who says it's his fault? You know, the University of Massachusetts. By the way, I don't know why I said Massachusetts. I understand the government works. They probably give contracts and stuff. But you've got the Federal Medical Center right up the road. It makes no sense to me or you and me, but we'll leave that aside. You don't have to go there. You probably feel the same way. I can see why they wouldn't do it for Carolina, but that's just me. I got you. But my point being here is that it is an aggressive cancer, and he's in prison to the extent of what he can do. And Lord knows we see enough cases here where prisoners have tried to do all kinds of stuff. That's typically not treated so very kindly. Not even a butler, and I know butlers seem to be a better facility from what I've seen. But this is a pretty aggressive thing, and I just don't know. This is something you should be able to just turn and say, oh, that's their fault. He's been sitting here for five months. We've been looking at him every day. We see what's going on here, and the man is, I mean, obviously he's got something going on. He didn't just sit there silently for five months. You can't with this kind of cancer. I can't imagine. The inmates, everybody's got to see what's going on with this man. They've got to be asking him every day what's going on. By the way, he's going to die, because this is serious stuff. And yet nothing is done. Well, Your Honor, one issue about the facts that I want to try to clear up from the United States' point of view is, you know, Dr. Katz had his recommendation that Mohs surgery be scheduled as soon as possible, and that was in July of 2013. Now, obviously, it's undisputed that the BOP approved that request, you know, pretty quickly and forwarded that to the UMass scheduler. Was that when they were waiting for the plastic surgeon? Okay, well, see, that's what I want to get to is that when they scheduled it in October and Dr. Cook, who was also an independent, Dr. Katz in July was an independent contractor. When the appointment, the follow-up appointment that Dr. Katz recommended was scheduled, and it was scheduled for October, when Dr. Cook saw Mr. Krimble, there was no notation that it was too late for Mohs surgery. What he said was, he was scheduled for the Mohs surgery in October. But it was Dr. Cook, the independent contractor, who said, I know you're here for Mohs surgery, but I really need to consult with the plastic surgeon first. Now, by the way, he died. I heard Krimble say he's state. I'm not sure I saw that in the record. He died. Since the appeal, he passed away. So, in October, Dr. Cook indicated, there was no indication that it was too late for Mohs surgery. But it was only from the period, and so when he recommended the consult with the plastic surgeon, BOP, once again, it's undisputed, they approved that really quickly and forwarded that to UMass just like they were supposed to. And that's not in dispute here. And then it was that five-week time from the end of October to the beginning of December that things really went downhill for the cancer. And it was that five-week period. And so essentially, Mr. Krimble's case is that during that five-week period, the BOP didn't ensure that I got my Mohs surgery done. Because going back, and I hate to repeat myself, from July to October, there's kind of been a presumption that things went downhill for Mr. Krimble during that point. But if you look at the record in this case, and the undisputed evidence, Dr. Cook never made that kind of representation. The only thing I wanted to say, it just seems obvious to me, if this man wasn't in prison, and he was out in an ordinary area, and had a doctorate, he would have had that surgery probably literally. The reason he doesn't have it is because he's in prison. He can't do those things. The reason those things weren't done is because of the UMass scheduling. It was not BOP. If you ask him if he hasn't been in prison, that's what I'm saying, I don't get it. He's in prison. He can't do those things. I don't know UMass even exists. I'm sorry, what was that? He doesn't even know UMass exists, or is a part of it. I think where we started this, the concern that, even today, how would a prisoner even know to seek redress from UMass? In a situation like this, like I said, you could have been the BOP administrative remedy, it could have been hiring an attorney, or trying to get family members perhaps, to track down that information. It could have come in the way of... People could be dead by then. Excuse me? People could be dead by then. In fact, he is. And he was sick when you brought him there. They transferred him to Butner for medical reasons, is that correct? Yes, correct. So they transferred him down to Butner, which is a medical facility. Correct. To be taken care of. Yes. And you all had this contract, and when you got sued, you came in and interposed the independent contractor doctrine, and the discretionary function doctrine. Right. And you won on the independent contractor doctrine. Well, it was also in the discretionary function, which is another part of my argument, that I think ties into a lot of what we're discussing here, because a lot of it goes back to, why can't BOP do more? Why didn't they follow up? Well, it has to do with resources and manpower. And when you're trying to sort out resources and manpower, those are, I think, recognized by just about every court, that those are matters of policy. And so the decision not to follow up with UMass was based upon the lack of manpower and lack of resources to do that. And so if they lack the resources and manpower to put that in the contract, they're not going to have the power to do it in the real world. Listen to me just for a minute. Yes, I'm sorry, go ahead. Is UMass providing all the medical services that are provided now at Butner? No, BOP provides its own primary care. They schedule primary care and they provide primary care. It's specialty care. You have a big hospital there at Butner, and that's why he was transferred down there, because you've got the medical facility, correct? Yes, based on his medical condition and the facilities at Butner, yes. That's right. And the relationship with UMass was basically secret. It's all sealed up, this contract. I mean, it's sealed for purposes of this case, but it's not secret. It's not secret from the public. I'm not aware of any hindrances. How can it be sealed up for this case if it's not classified secret? It was sealed up for this particular case. We seal up things in these court cases when they're top secret or classified or something. Well, these are not. Right. For some reason, this contract that you're pleading on the basis of this independent contract reduction is sealed. Yes, it was sealed based upon the content or the language of the contract was some type of proprietary language. It wasn't to keep it secret from everybody that UMass is scheduling. It was due to the proprietary language in the contract. Is there a UMass scheduler on site at Butner? Yes, as reflected in Dr. Stark's affidavit regarding this. It's an on-site scheduler for UMass. It's a UMass employee. So Judge Spiker and I just didn't dream that? No, no, no. That is very much based in reality. And that UMass scheduler was advised along the way of what was going on here? The UMass scheduler, whenever the URC for Butner approved the specialty care request for Mr. Krimble, and they were immediately forwarded to the UMass scheduler, at that point the UMass scheduler was aware of the need for that appointment. And once the UMass scheduler schedules the appointment, then the scheduler notifies BOP of the appointment, and then BOP's obligation to ensure the medical care is received by the patient takes place in the form of transporting the patient to and from the specialty care. That's right, but you're giving us all that in the context of a hypothetical. I'm asking you, in this case, as to this plaintiff, the UMass scheduler was advised along the way. And the UMass scheduler was supposed to have scheduled the surgery? Correct. I believe it was within, as quickly as soon as possible, or within a couple of weeks, I think from July to October, and then within a week from the October approval for a specialty care request. So did the UMass scheduler drop the ball, or did somebody above him, the UMass, drop the ball? I cannot speak for a UMass employee. I can only summarize that the appointment that BOP recommended be done within a week at the end of October wasn't done, and that within three or four weeks, by the third or fourth week in November, about 30 days later, Mr. Krimble did the administrative remedy request and got an appointment right away. And they were able to determine that at that point, in December, not October, but in December of 2013, it was too late for the Mohs surgery. Now, I don't know how much more time I have, but it's been... I don't think we probably don't have any more time. Okay. We've taken a lot of your time to answer a lot of questions. Do you have anything you want to add? Well, I was going to say, a lot of what is being discussed revolves around what choices BOP made regarding the contract, the contract terms, and the choices they made in this specific case. And I would submit to the court that those choices that arise from the 40-42 language, which I think the court would agree is very general in nature and doesn't mandate any specific actions by BOP, that the choices and judgment that BOP utilizes in entering the contract, the terms of that contract, and in this specific case, not following up with the UMAS scheduler, that is consistent with the discretionary function exception to the sovereign immunity waiver in the Federal Tort Claims Act. And so I would just remind the court that it wasn't just the independent contractor, it was the fact that the choices BOP made in this case were products of discretionary function as well. And that all these... And the failure of UMAS to get this fellow scheduled and to take good care of him must be a breach of your contract, right? I don't know if that would be a material breach. I think there are... While BOP certainly does not have day-to-day operations, I think they do have a general oversight. He didn't get the surgery that the doctor said he needed, and he died. Well, he died during this appeal. He did not die in BOP. He was treated... He did not get the Mohs surgery, but he was treated with radiation in December 2013, and I believe that while the wound would never heal completely, I believe that successfully attacked a cancer that was a problem at that time, in December 2013. But it was only recently that Mr. Krimble passed away. Well, let's see what Mr. Craven says about this. Yes, sir. Thank you. Thank you, Your Honor, for the time. I appreciate it. Good afternoon, and may it please the Court. David, go ahead. Good to be here. I have a number of things I would like to say. First of all, we have no quarrel with the University of Massachusetts nor with any doctors involved in Mike Krimble's care. As far as we're concerned, the doctors did their job. We had no inkling that the University of Massachusetts or any other academic institution was involved in this matter until the government's answer was filed, and the contract was completely sealed. There was no way, in our opinion, of anyone learning about it other than the way we learned about it, by filing suit and having the government say, well, it wasn't our fault, it was the University of Massachusetts. So it was, I think Judge King used the word secret, it was a secret agreement. How anyone, any inmate at Butner could possibly know of the involvement of the University of Massachusetts is a mystery to us. The BOP cannot contract out of their statutory responsibility to provide care. And that's what they are attempting to do in this case. The BOP, the government, couldn't have brought the University of Massachusetts into this case had they wanted to do so. We have never acknowledged that Michael Krimble had any relationship with the University of Massachusetts, contractual or otherwise. And by the way, it's our understanding, and I may be wrong, I can't swear to it, but I don't believe that the University of Massachusetts scheduler has ever been physically present at Butner. I think that person has always been in Massachusetts. Again, I can't cite chapter and verse on that. Dr. Cook, Dr. Jonathan Lambert Cook, who is the leading Mohs surgeon at Duke, in October 2013, as Mr. Renter indicated, did not say it was too late for the Mohs surgery then. It wasn't too late. But in December, it was. And I sensed an interest there on the part of the government in shifting a little of the blame for all this onto Dr. Cook, which I think is unfair. I would also like to speak up for my late dear friend Judge Fox down in Wilmington. I think Judge Fox got this matter right when he heard and ruled on the government's initial motion to dismiss. When Judge Flanagan heard it later on, after she got the case, she had nothing before her that Judge Fox had not had except the secret government contract with the University of Massachusetts. And that contract, which is in the record, makes an ordinary insurance policy read like poetry. And I don't think they could possibly have added anything to the case. Judge Fox can't speak for himself anymore, any more than Mike Kremble can. But didn't it add the independent contractor exception to the case? I'm sorry, Your Honor. You said that the contract didn't add anything to the case that Judge Fox didn't have. But didn't the contract coming to light add the independent contractor exception to the case? No, I don't think so at all. Why not? And it can't because, you know, the government can contract all sorts of things out, but the one thing they cannot contract out is their statutory obligation under 4042 to provide care. You know, Judge Fox said in his order that a more fully developed record may reveal that UMass was negligent and the defendant was not, but I don't think that's the case. We do not have any complaint against the University of Massachusetts. So Judge Fox knew that UMass was involved in this thing some way or another? He knew that they had some involvement with it, yes. He knew they had some involvement. They had a contract to provide the medical services. That's right, that's right. And that's an exception to the Federal Port Claims Act, Mr. Craven. Yes, it is. And the Federal Port Claims Act has to be strictly construed and it's only a waiver of sovereign immunity in limited circumstances. I absolutely agree with that. And that's what I was going to call the table there is arguing about. He says this indefendent contractor exception and this discretionary function doctrine both take this claim out of the Federal Port Claims Act and gives the government sovereign immunity. There's no waiver in this context. That's the argument the government's made. That is indeed the argument the government's making and I think they're dead wrong because they cannot contract out of their statutory duty to take care of these folks in prison. They cannot pass that on to the University of Massachusetts. And, you know, the BOP is clearly negligent here. Clearly. And, you know, maybe the University of Massachusetts is too. But the remedy there is for the BOP to bring them into this case, which they did not do. And the government mentioned that there hadn't been any... You could have brought them into the case. Pardon? Could you have brought them into the case? Could we have? Yeah, you're saying the government didn't bring them in. You're a... We had no reason... We had no reason to bring them in. The government might have wanted to bring them in by way of contribution. The government mentioned that there had been no FOIA request. I don't know how they... I don't know how they think we got the criminals' medical records without a FOIA request. Well, we'll do our best. Your bell went off there, Ms. Craven. And... Good to see you. And we're going to take this thing under advisement. And if we were in Richmond, we would leave the bench now, and Judge Wynn and Judge Thacker and I, and we'd come down and shake hands with you fellas. So you'll tell each of you you did a fine job. Well, I've done that many... I always look forward to that in Richmond. And we appreciate you very much. And may that day come again.  It's going to come again. Thank you, Judge. Thank you all so much. Thank you. Thank you, everybody. Adjourn court until tomorrow. Yes, sir. Everybody take care. Dishonorable court stands adjourned until tomorrow. God save the United States and this honorable court.
judges: Robert B. King, James A. Wynn Jr., Stephanie D. Thacker